(No. 5215-

RONEY R. NUNES, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed July 9, 1970.*

JAMES P. CHAPMAN, Attorney for Claimant.

WILLIAM G. CLARK, Attorney General; PHILIP ROCK and SHELDON K. RACHMAN, Assistant Attorneys General, for Respondent.

PERLIN, C.J.

Claimant seeks recovery of the sum of $30,000.00 in this action brought pursuant to Ch. 37, Sec. 439.8(c), Ill. Rev. Stat., 1969, which provides as follows:

"The Court shall have exclusive jurisdiction to hear and determine the following matters:

(c) All claims against the State for time unjustly served in prisons of this State where the persons imprisoned prove their innocence of the crime for which they were imprisoned; provided, the Court shall make no award in excess of the following amounts: . . . for imprisonment of 14 years or less but over 5 years, not more than $30,000.00. . ."

Claimant contends that he was unjustly imprisoned for nine years after being convicted of taking indecent liberties

with Mary Lee Hill, a minor, and contributing to her delin-
quency.

The record reveals the following evidence:

After his trial and conviction claimant became a
pauper, and was unable to employ counsel to seek review
of his conviction until the Supreme Court of the State of
Illinois appointed counsel to represent claimant in the
prosecution of a writ of error. On January 22, 1964, the Il-
linois Supreme Court reversed the judgment of the Circuit
Court of Lake County, Illinois, and, on February 20, 1964,
claimant was released from the Illinois State Penitentiary,
having been discharged.

In the instant proceeding, claimant must prove by a
preponderance of the evidence that he was innocent of the
crime for which he was imprisoned. The opinion of the Il-
linois Supreme Court in the case of *People of the State of
Illinois* vs. *Roney R. Nunes*, 30 Ill. 2d 143, 195 N.E. 2d 706
(1964), is part of the record in this proceeding as follows:

"*The People of the State of Illinois,* Defendant in Error, vs. *Roney R.
Nunes,* Plaintiff in Error, 30 Ill. 2d 143, 195 N.E. 2d 706 (1964).

"Mr. Justice Underwood delivered the opinion of the court:

"The defendant, Roney Nunes, was tried by jury in the Circuit Court of
Lake County, and convicted of the crime of taking indecent liberties with a 12-
year-old girl. He was sentenced to the penitentiary for a term of not less than 4 nor
more than 12 years. We have issued a writ of error to review the judgment of
conviction.

"The defendant contends that the evidence was insufficient to establish his
guilt beyond a reasonable doubt. Mary Lee Hill testified that on Sunday, April 3,
1954, she and Frances Kelly, another 12-year-old girl, went to the office of the
Veterans Cab Company where the defendant was working as a dispatcher. After
some conversation between the two girls and the defendant, the defendant asked
Mary Lee to take off her sweater because it was warm in the office. She told the
defendant she was not warm, and did not remove her sweater. The defendant
then asked her to sit on his lap, and after first refusing, she did so when Frances
told her to go ahead. The defendant put his arm around her, kissed her, and
fondled her, and induced her to touch his private parts. The defendant asked her
to go in the other room with him, but she told him she could not, because of her
menstrual period. Frances Kelly was in the same room with the defendant and

Mary Lee at the time these acts took place. She testified that she was sure that these events occurred on April 3. On cross-examination the witness testified that she and Frances Kelly went downtown looking for the cab office. The office was on the second floor, and the defendant called out of the window, told the girls to go around to the back of the building, and come up the stairs. She and Frances were in the office for about 4 hours except for a short time after the alleged indecent acts when they went to a drug store, and returned with coffee for the defendant and soda for themselves. During the time they were in the office the defendant was busy answering the phone, and talking to cab drivers on the radio. He also talked to a girl and a cab driver who came up to the office, and talked through the window to cab drivers on the street. The defendant was seated at his desk during all the time the girls were in the office. Mary Lee testified that she had never been in the cab office before the day in question, and that she never went back there. She did not tell her mother about these incidents until a week or two later. The defendant was indicted for the offense in July, and Mary Lee testified that in August, with her mother's consent, she worked as a baby sitter in the defendant's home while the defendant's wife was out of town.

"Frances Kelly testified that she could not remember the exact date of the alleged offense but remembered that it was a Sunday in April. She testified that she saw Mary Lee sit on the defendant's lap, saw him kiss Mary Lee, and perform some of the other acts to which we have referred. On cross-examination she testified that the defendant was busy answering the telephone and dispatching cabs over the radio. The defendant remained seated at the desk in the cab office during the time the girls were there. The desk was near a large front window, and people on the street in front of the office could look up and see the defendant. Frances did not tell her mother about the events in the cab office until about a week later. After she told her mother she also worked as a baby sitter for the defendant. She testified that she and Mary Lee had been in the cab office together two or three times.

"For the defendant, one Nick Perusky testified that at the time in question he was the owner of the cab company. The defendant was his brother-in-law, and he occasionally employed the defendant as a dispatcher on a part-time basis. After referring to a record, which had been kept in compliance with regulations of the Federal Communications Commission, Perusky testified that April 3 was a Saturday. According to the record the defendant had not worked at the cab office on either April 3 or April 4, and the last time prior to April 3 that the defendant worked in the office was on March 24.

"The defendant testified that on Saturday, April 3, he went to work as a bus driver at about 4:15 p.m., and did not work in the cab office at any time during that day. On Sunday, April 4, he also worked for the bus company, and was not in the cab office. He testified that neither Mary Lee Hill nor Frances Kelly had ever been in the cab office while he was there.

"It is axiomatic that a charge of indecent liberties is an accusation easily made, hard to be proved, and harder to be defended by the party accused. (*People* vs. *Hinton*, 14 Ill. 2d 424.) In such cases reviewing courts are especially

charged with the duty of carefully examining the evidence, and, while due weight must be given to the judgment of the jury as to the credibility of the witnesses, it is our duty to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and create an abiding conviction that he is guilty of the crime charged. In our opinion the testimony of the two girls was not sufficient to remove all reasonable doubt as to the defendant's guilt. The testimony of the complaining witness as to the date of the occurrence was obviously incorrect, since both girls testified that the incidents occurred on a Sunday, and April 3, the date alleged in the indictment and the date referred to by the complaining witness, fell on a Saturday. The testimony of the complaining witness that she had never been in the cab office before or after the occurrence was contradicted by the testimony of her friend that both girls had been there several times. The testimony of both the complaining witness and her friend that they did not tell their parents about these incidents until more than a week later in itself tends to create some doubt as to whether these events occurred. Even more significant is the fact that after these supposed indecent acts by the defendant, and after these acts had been reported to the parents of the girls, the parents permitted the girls to work as baby sitters in the defendant's home while the defendant's wife was out of town. According to the testimony of the complaining witness she worked as a baby sitter for the defendant for several days, even after the indictment had been returned against him. The alleged indecent acts were supposed to have taken place in a busy cab office where the defendant was constantly answering the telephone, talking to other people, and dispatching cabs on the radio, and supposedly occurred while the defendant was seated at a desk in front of a large window in the office. The combination of all of these circumstances is sufficient to create a reasonable doubt as to whether the defendant was guilty of the crime alleged in the indictment. It cannot be said in the face of contradictions and the improbabilities in the testimony of the two girls that the evidence creates an abiding conviction of the defendant's guilt.

"It does not appear that any additional evidence could be produced on a new trial, and, therefore, the cause will not be remanded. The judgment of the Circuit Court of Lake County is reversed.

Judgment reversed."

In addition to the evidence presented at the original trial, claimant produced the following at the trial before the Commissioner of the Court of Claims:

Claimant's testimony as to his work schedule for April 3 and 4, 1954, was corroborated by records of the Waukegan-North Chicago Transit Company and the testimony of Kenneth E. Johnsen. Johnsen testified that in April, 1954, he was the station supervisor of the company. He produced station reports and run reports maintained by

the company in its usual course of business. Johnsen testified that the reports have been kept continuously in the company files since April, 1954, and that they showed that on April 3, 1954, claimant operated Bus No. 57 from 5:03 p.m. until 8:42 p.m.; bus No. 51 from 9:12 p.m. until 12:42 a.m.; and, that on April 4, 1954, he operated bus No. 59 from 4:50 p.m. until 8:57 p.m.; and bus No. 62 from 9:27 p.m.. to 12:43 a.m.

William D. Moore testified that he was employed by the Waukegan Veterans Cab Company as a driver and dispatcher prior to and at the time of the occurrence in question; that on April 3 and 4, 1954, he was working at the dispatcher's office of the Waukegan Veterans Cab Company as a dispatcher. His duties as a dispatcher were to answer the telephone, write down incoming calls, the time the drivers cleared, their destination, and similar information. He entered this information on a desk or master sheet. Moore produced two master sheets dated April 3 and 4, 1954. The writing on the sheet for Saturday, April 3, 1954, was all in his handwriting for the time period between 1:00 p.m. and 7:00 p.m. His examination of the master sheet, dated April 4, 1954, indicated to him that he had been on duty from at least 11:00 a.m. to 11:00 p.m.

Linton Godown, an expert on questioned documents, testified that he had examined the handwriting on the desk or master sheets of the Waukegan Veterans Cab Company for April 3 and 4, 1954, and had compared entries made on those sheets with a standard of claimant's handwriting. He concluded that none of the entries on the sheets were made by claimant.

The testimony of Nick Perusky, the owner of the Veterans Cab Company, at the original trial was made part of the record by stipulation. At the trial he testified that he employed claimant when he needed help rather than on a

steady basis. He produced a record book, which the Federal Communications Commission requires be kept. His dispatchers had to use the book to sign in and out when they got on or off work. From his refreshed recollection he testified that six different persons had worked as dispatchers on April 3, 1954, and that claimant was not one of them. He himself had worked from 2:45 to 6:00 p.m. that day. He testified that William Moore had worked all afternoon on the day of April 4, 1954. He stated that it was unlikely that any dispatcher could have been relieved by somebody for a short time. The only time Nunes apparently worked during the general time in question was March 24, 1954.

Mrs. Lillian Lorraine Humphrey testified that she was married to claimant in 1945, and divorced from him in 1958. In July, 1954, she went to Rhode Island with two of her children, and left the other two children with her husband. She had been away from Waukegan for three or four days when she received a telegram that her husband had been arrested. Before she left she had made arrangements for baby sitting for the children with Frances Kelly, who lived next door. Frances Kelly had sat for the Nunes' children many times on prior occasions, and Mary Hill usually sat with her. Mrs. Kelly knew that Frances was going to sit for the Nunes' children. The witness had never learned from the Kelly or Hill girls, or their parents, that her husband was supposed to have taken indecent liberties with either of them, and in the three or four month period prior to going to Rhode Island the Kelly and Hill girls were the only baby sitters she had.

The witness had also worked at The Waukegan Veterans Cab Company prior to the time her husband was arrested, and had seen both of the girls at the cab company offices. The uncle of Frances Kelly also worked there. Dur-

ing the six month period, which preceded her husband's arrest, his days off from the bus company were Thursday and Friday. He was required to wear freshly laundered uniforms twice a day when he worked at the bus company. During the six month period prior to the time he was arrested he could not have worked for the cab company a portion of the day on Saturday or Sunday, because his hours were too irregular, and he would sleep when he was home. She further testified that she was home on April 3 and 4, 1954, that she was present at the original trial, but was not called to testify.

Nunes testified that Frances Kelly lived next door to him, and Mary Lee Hill lived a block away. The girls were frequently baby sitters in his house. The first time he had knowledge of a charge being brought against him by Mary Lee Hill was on July 22 or 23, four months after the alleged occurrence, when he was asked to come to the State's Attorney's office. He was accused of taking indecent liberties with Mary Lee Hill, and remained in jail for three months when his bond was reduced. He was tried on March 15, 1955, the same date that the verdict was entered, and he was sentenced on April 6, 1955. He was then taken to the penitentiary where he remained at the Statesville and Menard branches until February 22, 1964.

On April 3 and 4, 1954, he was working for the bus company, arriving there about 4:10 p.m. and working until 12:42 a.m. on April 3, and arriving at the same time on April 4, 1954, and working until 12:43 a.m.

On the day before he was arrested (July 22, 1954), and while his wife was in Rhode Island, Nunes came home during a break in his bus run shortly after noon when the Hill and Kelly girls were sitting with his two children. When he entered his house, he saw that one of the girls was holding a lighted cigarette to the mouth of his seven year old child,

and the other girl was talking on the telephone. Nunes discharged the girls, paid them, and they left the house. He then put the children in the back yard where he asked a neighbor to watch them, and returned to the bus company to complete his bus run, which extended for over two more hours. After Nunes was finished with his work, he drove by his house to take a fellow employee's car to downtown Waukegan as a favor, and saw his children walking with Mary Lee Hill and Frances Kelly. He stopped the car, told the girls to leave his children alone, and instructed his children to return home. He then delivered the car and returned home, but his children were not there. He went to the Kelly home where he was told his children were at the home of Mary Lee Hill. He went to the Hill home, but no one answered. He was again told his children were at the Hill home, and, when he returned Mrs. Hill answered the door, he took his children. Nunes then testified as follows:

"Yes. I called Mrs. Hill on the phone immediately after—shortly after I arrived home and told her that my daughter had said she had been given beer to drink by Mrs. Hill, while I was at the door Mrs. Hill held my oldest daughter on her lap, and her daughter held my youngest with her hand over her mouth so when my child heard my voice she couldn't call out to me.

So I told Mrs. Hill I was going to have her arrested the next day for kidnapping, for giving my child intoxicating liquor, and living 'common law, with someone that she wasn't married to'."

Claimant then stated he never had any further conversations with Mrs. Hill, and that the next day he was called down to the State's Attorney's office; that he did not at any time take any indecent liberties, or do any other improper acts to Mary Lee Hill. His testimony also established that he had his own limousine service with six cabs, which netted him about $125.00 per week, and he was also employed at the Waukegan-North Chicago Transit Company as a bus driver for two years up to July 21, 1954, when he was arrested.

Mary Lee Hill testified that on April 3 or 4, 1954, she was going to be 13 in May; that she went to the cab office

with Frances Kelly on the day she thinks was a Sunday in the afternoon; that she thinks she babysat once for Roney Nunes and his family; that she didn't remember whether she sat before or after the events, which happened at the cab office on that Sunday; that she had never gone to the cab office at any time except April 3 or 4, 1954; that she did not remember much of the testimony at the original trial; that she did not tell her mother about what happened when she got home, but probably did a week or more after she was in the office. At the original trial, Mary Lee Hill testified that on Sunday, April 3, 1954, she and Frances Kelly were present at the offices of the cab company from about 2:00 p.m. until 6 or 6:15 p.m. when the alleged acts took place; and that she babysat for the Nunes' children at various times with her mother's knowledge.

Mary Furman, who did not testify at the original trial, stated that she was the mother of Mary Lee Hill; that in August, 1954, she called the Lake County State's Attorney subsequent to the following conversation with her daughter:

" 'Well, did he ever try anything with you or anything?' So then she told about his inviting the two girls to this cab company, and I says, 'Well, did you go?', and she says they did. She said he tried to kiss them, and this, that and the other, and I says, 'Was that all there was to it?' She claimed it was."

### The record continues:

Q. "To the best of your recollection was this the first and the only occasion on which you talked to your daughter about her relationship . . . any occurrence with Roney Nunes?"
A. "Yes."
Q. "So that from April, when the alleged event took place, until August when your daughter told you about it, you had no knowledge of these things?"
A. "No, I didn't."

Mrs. Furman did not refute the conversation, which Roney Nunes claimed took place between them over the phone, and her testimony apparently refers to the incident. The testimony of Mrs. Furman also contradicts that of Mary Lee Hill as to when Mary Lee Hill told her mother of Nunes' alleged misconduct.

Respondent argues that the testimony of witnesses, who had not been called at the original trial (in this case, Kenneth E. Johnsen, William Moore, Linton Godown, and Lillian Lorraine Humphrey), should be barred, since all the witnesses and the records of the bus company could have been produced at the original trial.

Respondent cites the case of *Dirkans* vs. *State of Illinois* Case No. 4904, in support of its proposition. In that case the claimant, who had been found guilty of armed robbery, produced an alibi witness at the Court of Claims hearing. The witness had been available at the original trial, but was not called. The Court found that Dirkans had failed to prove his innocence of the crime for which he was imprisoned.

The production of such a witness at a Court of Claims hearing raises a question of credibility of that witness. In the instant case, no one has questioned the credibility of either the witnesses or the two sets of documents, which have clearly established that claimant was present at his job with the bus company, and was not present as a dispatcher in the office of the Waukegan Veterans Cab Company on either April 3 or 4, 1954, during the hours charged. The records were kept in the regular course of business of the two companies, and not one scintilla of evidence has been presented which would refute their accuracy.

Claimant has proved himself innocent of the crime for which he was imprisoned by the *de-novo* hearing, which is contemplated under Sec. 439.8 C of the Court of Claims Act.

Claimant has suffered a substantial loss during his nine years of imprisonment. Claimant is hereby awarded the sum of $20,000.00.